Filed 1/9/24  In re D.J. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.J. et al., Persons Coming Under the Juvenile Court Law. | B329237 |
| | (Los Angeles County Super. Ct. No. 20CCJP01149) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.J., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

C.J. (Mother) appeals the juvenile court's order terminating her parental rights to her daughters D.J. and V.J. (collectively, Minors).[1] We are asked to decide whether the juvenile court erred in declining to apply the parental benefit exception to law that otherwise requires terminating parental rights. Specifically, we chiefly consider whether the juvenile court erred by not expressly stating the reasons for its ruling on the record and by considering improper criteria in making that ruling.

## I. BACKGROUND

### A. *Investigation, Removal, and Assumption of Jurisdiction*

In February 2020, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging Mother was using drugs. At the time, five-year-old D.J. and three-year-old V.J. were living with Mother and maternal grandmother J.J. (Maternal Grandmother).

A Department social worker visited the family home. Maternal Grandmother reported Mother was in and out of the house and was currently using marijuana and "speed." She reported Father also used drugs. D.J. reported Maternal Grandmother "smokes from glass in the house," Mother "smokes every[ ]day," and Father also "smokes." V.J. described smoking

---

[1] D.J. and V.J. share the same father, V.C. (Father), but he is not a party to this appeal. We therefore only discuss Father and his role in the proceedings to the extent they are relevant to Mother's appeal.

by Maternal Grandmother, Mother, and Father in nearly identical terms.

When questioned by a social worker, Maternal Grandmother admitted she smokes marijuana and had used crystal methamphetamine that day. The social worker took Minors into protective custody based on exigent circumstances and they were later placed with paternal grandparents R.L. and V.C. (collectively, Paternal Grandparents); paternal aunt K.C. also lived in their home.

In subsequent conversations with Department personnel, Mother admitted she began using methamphetamine in mid-2018 and continued using two to three times per week since then. Father, who was incarcerated at the time, admitted he was a recovering addict and had struggled with methamphetamine and marijuana abuse.

The juvenile court asserted dependency jurisdiction over the children in June 2020 based on the substantial risk of serious physical harm presented by Mother, Father, and Maternal Grandmother's ongoing substance abuse—which prevented them from providing Minors with ongoing care and supervision. Mother was ordered to participate in services including a drug program, random drug testing, a parenting course, and individual counseling. She was granted three hours of monitored visitation at least two times per week.

B. *Mother's Visitation and Eventual Termination of Reunification Services*

In December 2020, the Department reported Minors were being well cared for by Paternal Grandparents. Minors told a

3

social worker that they wanted to have visits with Mother and Father but did not want to live with them.

Paternal Grandmother reported Mother's visits were scattered and Mother was mostly on her phone during visits. Minors also stated Mother did not want to play with them. Minors referred to Mother by her first name and did not seem distraught when she did not visit.

Mother enrolled in an inpatient drug rehabilitation program in July 2020, but she checked herself out of the facility approximately four days later. Mother did not appear for weekly drug testing and had not participated in parenting classes or individual therapy.

Mother visited Minors for an hour on Christmas Eve in 2020, was on her phone the entire time, and did not engage with the children. In February 2021, Minors' babysitter reported D.J. had thrown an object and was upset because of a visit with Mother. The babysitter also said Mother reinforces D.J.'s bad behavior toward Paternal Grandmother, explaining Mother gave D.J. a "thumbs up" when she misbehaved. Around the same time, Mother told a social worker that she had been sober for a month and was inquiring about rehab, but she also stated she was not willing to participate in an inpatient program.

In late March 2021, Paternal Grandmother informed the social worker she was willing to adopt Minors. When Paternal Grandmother informed Mother, Mother told Paternal Grandmother to return the children to her after Paternal Grandmother adopted them. When Paternal Grandmother said she would not do so, Mother ceased visiting for some period of time.

A few months later, Mother claimed to have enrolled in an outpatient drug treatment program. When contacted, however, the program advised Mother had participated in walk-in services but was not enrolled in any programs.

At a September 2021 status review hearing, the juvenile court found Mother's progress had been minimal. But the court also found the Department had not complied with the case plan by making appropriate efforts to provide reasonable services, and the court ordered continued reunification services.

Mother did not call or visit Minors at all from October 31 to December 23, 2021. When Mother did make contact, she usually visited Minors two to three times per month. Mother would sometimes call Paternal Grandmother at 8 p.m. on a school night saying she wanted to visit, and Paternal Grandmother would have to tell Mother that Minors were already preparing for bed.

By late February 2022, Mother had not provided proof of participation in any court ordered services. The juvenile court terminated reunification services for both Mother and Father in March 2022.

C.    *Visitation and Other Events After Termination of Reunification Services*

Mother visited Minors for about 30 minutes once in June of 2022 and then did not visit again until the end of August. In the six months preceding September 2022, Mother visited Minors a total of six times.

Before the permanency planning hearing, the juvenile court ordered the Department to submit a report addressing the considerations identified in *In re Caden C.* (2021) 11 Cal.5th 614, a case in which our Supreme Court provided guidance regarding

5

what must be shown to qualify for the parental benefit exception to law otherwise requiring termination of parental rights.

From late August 2022 through January 2023, Mother attended approximately three out of four scheduled visits. From January 2023 through mid-April 2023, Mother either attended or made up all scheduled visits. By March 2023, Mother was visiting Minors on Sundays for approximately two to three hours. The visits were positive. Minors expressed happiness during Mother's visits because they spent time catching up, talking, watching movies, and playing outside.

### D. *The Department's* Caden C. *Report*

The Department filed a status report in April 2023 to respond to the juvenile court's request for a *Caden C.* analysis. The report summarized Mother's recent, increased visitation. It stated that, starting in September 2022, the visits consisted of watching movies, talking about how the children are doing, and playing games. Mother sometimes also brought Minors birthday gifts including toys and snacks.

Addressing whether there was consistent and regular contact between Mother and Minors, the report stated Mother and Father raised Minors at the Paternal Grandparents home until 2019, when the parents separated. Mother and Minors then lived with Maternal Grandmother until the Department intervened and removed Minors from the home. From 2020 to 2022, Mother's visits were infrequent and inconsistent. Mother was also arrested and in custody for 11 days in August 2022.

Regarding whether there was a beneficial parent-child relationship between Mother and Minors, the report stated the relationship was inconsistent from 2020 to 2022 due to Mother's

6

unresolved substance abuse issues and incarceration. D.J. was eight years old at the time of the report, and had been five years old when placed with Paternal Grandparents. V.J. was seven years old at the time of the report, and had been four years old at the time the proceedings started. The social worker opined there were concerns due to Mother's unresolved substance abuse history, absence from Minors' lives, and incarcerations. According to the Department's report, Minors expressed happiness when Mother visited but they did not demonstrate a significant connection with Mother because they did not ask for Mother or ask to speak to Mother when she was not present. D.J. said she liked when she and Mother cuddled together. She also said she felt she had a good relationship with Mother because Mother played with her when she visited and ate popcorn with her. V.J. said she felt like she was close to Mother.

The social worker opined Mother did not meet Minors' emotional, social, physical, and psychological needs. The social worker also opined Mother does not provide significant comfort to Minors, but rather supplies them with fun visits. D.J. views Mother as someone with whom she watches movies. V.J. views Mother as a good parent because Mother brought her shampoo and conditioner, balloons, and a bracelet kit.

D.J. reported she would feel sad if she did not have visits with Mother, but she said she would not act out and would continue being the same person without them. V.J. similarly said she would be nice and not act out without the visits. The social worker opined adoption would create a new sense of stability for Minors and a plan less than adoption would be harmful because it would be revocable. The Department concluded termination of

parental rights remained appropriate and adoption would be beneficial.

### E.  Termination of Parental Rights

The juvenile court held a permanency planning hearing in May 2023.  Mother testified at the hearing.  Mother stated she had an in-person visitation schedule and had been consistently attending her visits every week.  According to Mother, Minors screamed "Mommy's here" when she arrived.  She denied they ever called her by her given name.  Mother stated that during her visits with Minors they watch movies, play outside, eat together, or do their homework.  She described her emotional bond with Minors as strong, explaining they love her and her absence would make them sad.  She asserted they always ask her to stay longer at the end of their visits and are sad when she has to leave.  She believed it would be detrimental to Minors to terminate her parental rights.

Following Mother's testimony, her attorney argued there had been consistent, regular visitation; there was a beneficial emotional attachment between Mother and Minors; Minors would experience a severe loss if Mother were cut from their lives; and it was in Minors' best interest to maintain their relationship with Mother.  Mother asked the court to order a permanent plan of legal guardianship so Mother could maintain her parental role.

The Department argued the *Caden C.* standard for invoking the parental benefit exception was not met because even though Mother's recent visits had been consistent, the visits overall had been sporadic.  The Department further argued that even if visitation were sufficient, a beneficial relationship between Minors and Mother did not exist because there was no

indication Minors were asking for additional visits or more time. Their relationship with Mother appeared to be more of a friendship. The Department further argued Mother's testimony indicated the termination of the relationship would be detrimental to her, not Minors, particularly given the love, support, and stability provided by Paternal Grandparents for the past three years.

Minors' counsel argued Mother had not been consistent in her visits during the pendency of the case, with the exception of the time period from September 2022 to May 2023. In Minors' counsel's view, seven months of weekly visits did not make up for the lack of regular contact over the preceding years.

The juvenile court ruled it would terminate parental rights "for the reasons argued by [Minors' counsel] and [the Department] and the *In re: Caden C.* analysis in the reports." The juvenile court remarked that Mother has a tendency to disappear from Minors' lives when she is abusing drugs and elaborated: "I am not finding that her failure to complete a case plan is . . . a reason to terminate[ parental rights], per se. What I'm saying is Mother's failure to achieve sobriety, and claims in the past that turned out to not be true to be in rehab, leads her to disappear from the children, and that risk remains." The court acknowledged Mother's recent visits had been consistent, but it also stated the chance of her disappearing at some point in the next few years was still high because she had not completed rehab. The juvenile court then found continued jurisdiction was necessary, found Minors were adoptable, and found no exception to adoption applied.

9

## II.  DISCUSSION

Mother's arguments for reversal are at times difficult to discern due to a lack of organizational focus (Cal. Rules of Court, rules 8.412(a)(2), 8.204(a)(1)(B)), but we see no argument meriting reversal of the parental rights termination order.  The juvenile court was not required to say more than it did on the record to explain its finding that the parental benefit exception did not apply.  The court's parental rights termination order, which is predicated in part on an independently sufficient finding that Mother had not maintained the requisite consistent visitation with Minors, does not rest on consideration of criteria that should not be part of a parental benefit exception analysis.  And Mother's remaining arguments concerning legal guardianship, Minors' views on adoption, and the Indian Child Welfare Act all lack merit.

### A.     The Juvenile Court Was Not Required to Further Explain Its Reasons for Finding the Parental Benefit Exception Inapplicable

At a section 366.26 hearing, a juvenile court decides "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan."  (*Caden C.*, *supra*, 11 Cal.5th at 625.)  "[I]f a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions." (*Ibid*.)

One of these exceptions is the parental benefit exception. The exception is "limited in scope" and applies where "'[t]he court finds a compelling reason for determining that termination would

10

be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) From th[is] statute, [our Supreme Court] readily discern[ed] three elements the parent must prove to establish the exception: (1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at 631, third, fourth, and fifth alterations added.)

A reviewing court uses the substantial evidence standard to evaluate a juvenile court's determination of the existence vel non of a beneficial relationship. (*Caden C.*, *supra*, 11 Cal.5th at 639.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Id.* at 640.)

In finding the parental benefit exception did not apply, the juvenile court stated that "for the reasons argued by [Minors] and [the Department] and the . . . *Caden C.* analysis in the reports, I am going to terminate parental rights." The court also made further remarks on the record concerning Mother's risk of again disappearing from the children, as she had in the past. This was more than adequate under the circumstances.

"[W]e are aware of no requirement—and [Mother cites] no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. To the contrary, we infer

11

from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156; see also *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [appellate record supported implied finding by juvenile court that parents had failed to establish the parental benefit exception].) Juvenile courts are encouraged to explain their reasons to facilitate appellate review, but the absence of such an explanation is not cause for reversal here—particularly when the court ordered the Department to prepare a report providing a *Caden C.* analysis and gave its reasons on the record, albeit in shorthand by adopting arguments made by others.[2]

> B. *Reversal of the Parental Rights Termination Order Is Not Required Because It Does Not, as Mother Asserts, Rest on Impermissible Considerations*

Mother contends the juvenile court erred by considering various factors that *Caden C.* holds should not be part of a

---

[2] The absence of a more detailed statement of reasons is not, as Mother appears to argue, an indication that the court was unaware of factors bearing on whether the parental benefit exception should apply. "Absent evidence to the contrary[, and there is none here], we presume . . . the trial court knew the law and followed it." (See, e.g., *People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)

parental benefit exception analysis. Specifically, Mother states the court impermissibly considered her inability to provide a safe home for Minors, her drug abuse history, the quality of her "parental" relationship with Minors, and what Mother thinks is speculation regarding the future effect of Mother's unresolved drug abuse.

We do not read the record to demonstrate the juvenile court considered impermissible factors, but even if Mother is right in asserting the contrary, the consideration was still harmless. (*In re Celine R.* (2003) 31 Cal.4th 45, 60 [reversal warranted only if it is reasonably probable the result would have been more favorable to the appellant but for the error].) In adopting the arguments of the Department and Minors' counsel, the juvenile court found Mother did not satisfy the regular visitation element of the parental benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at 636 [a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things," one of which is "regular visitation and contact with the child, taking into account the extent of visitation permitted"].) The facts that Mother believed the court impermissibly considered are not relevant to whether that regular visitation element was established—and the juvenile court appropriately determined it was not.

The dependency proceedings in this matter spanned more than three years. For the first two and a half years, from March 2020, when Minors were placed with Paternal Grandparents, to September 2022, Mother's visitation was inconsistent and scattered. In the six months preceding September 2022, for example, Mother only visited Minors six times. There were at least two periods, in late 2021 and in the summer of 2022, where Mother fell out of contact and failed to visit for approximately two

13

months in a row.[3] That sort of record of visitation cannot support application of the parental benefit exception. (*In re J.C.* (2014) 226 Cal.App.4th 503, 531 [regular visitation not present when there were significant lapses in visitation]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212; *In re C.F.* (2011) 193 Cal.App.4th 549, 554.)

To be sure, Mother's visits did later become more consistent during the seven months from September 2022 to April 2023. But we assess the regularity of the visitation throughout the entire course of the dependency proceedings and, viewed through that lens, the late improvement was too little. (*C.F.*, *supra*, 193 Cal.App.4th at 554 ["[The mother] was more consistent with visitation as the section 366.26 hearing neared, but we agree with the . . . assessment that overall her visitation was sporadic. Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].) Because Mother did not establish regular visitation, it matters not whether the juvenile court made reference to her drug abuse history, the quality of her "parental" relationship with Minors, or other facts that would not change the determination of whether there was regular visitation. In the absence of consistent visitation, the parental benefit exception cannot apply.

---

[3] Apart from quantity, the quality of the visits that Mother did attend during the first two-plus years was frequently subpar; Mother reportedly spent much of the visits on her phone rather than engaging with Minors.

*C.     Mother's Remaining Contentions of Error Fail*

Mother also contends the juvenile court erred in terminating her parental rights because the Department did not discuss legal guardianship with Paternal Grandparents (instead of adoption), because the court failed to take the wishes of the Minors into account, and because the court purportedly failed to make a finding that ICWA and related California law did not apply.  All of these points are meritless.

Mother did not object below to the social worker's failure to propose the alternative of legal guardianship to the Paternal Grandparents when they expressed a desire to adopt Minors.  The argument made now that the social worker should have done so is accordingly forfeited.  (*In re Carrie W.* (2003) 110 Cal.App.4th 746, 755.)  In addition, even on the merits, Mother's contention runs contrary to the Legislative preference for adoption.  (*Celine R.*, *supra*, 31 Cal.4th at 53 ["'The Legislature has . . . determined that, where possible, adoption is the first choice . . . 'because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]"].)

As for asking Minors about their preferences, the record reflects the Department did inquire into their wishes and they said they wanted to be adopted by Paternal Grandparents.  Mother apparently believes this was insufficient to ascertain their true desires because the Department's reporting did not "indicate[ ] the children were actually app[rised] of what adoption entailed, and that 'adoption' entailed more than just not having visits . . . ."  That, however, is not what the record reveals.  A status review report prepared by the Department states:  "The relative caregivers and the children continue to be committed to

15

[the] adoption process.  The children mentioned that they understand that their grandparents will be their parents and make decisions about their education and medical [treatment].”

Finally, Mother also contends the juvenile court never made a definitive ICWA finding after ordering additional inquiry efforts in 2023.  That, again, is wrong on the record.  At the section 366.26 hearing in May 2023, the court stated: “[T]he maternal grandmother and paternal grandparents have denied Native American ancestry, so . . . based on the Department’s reasonable and diligent inquiry, I find [ICWA] does not apply to any of the children.”

DISPOSITION

The juvenile court's order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



KIM, J.